# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

02 APR 30 PM 4:00

U.S. ...
N.D. OF ALA...

SCOTT GALLANT,         ]
                      ]
    Plaintiff,      ]
                      ]
    vs.             ]    CV-00-N-3754-W
                      ]
DILLARD'S, INC.,        ]
                      ]
    Defendant.    ]

## MEMORANDUM

**ENTERED**
MAY 0 1 2002

## I.    Introduction.

This case involves claims brought pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-34 (2002) ("ADEA"), and the Alabama Age Discrimination in Employment Act, Ala. Code §§ 25-1-1 to -29 (2002) ("AADEA"). The court retains subject matter jurisdiction pursuant to both federal question and diversity jurisdiction. Presently before the court is defendant Dillard's, Inc.'s ("Dillard's") motion for summary judgment, filed February 4, 2002. [Doc. # 18.] The issues have been briefed by both parties and are ripe for determination. Upon due consideration, the court finds that the motion is due to be granted.

## II.    Facts.[1]

In August, 1993, Scott Gallant became the store manager for Gayfer's Department Store in Tuscaloosa, Alabama. (Gallant Dep. at 69.) In 1998, Dillard's purchased several

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).



Gayfer's stores, including the Tuscaloosa store. (*Id.* at 140.) The store began converting to Dillard's operating systems soon thereafter. (*Id.* at 142-43.) Gallant's annual salary of $86,000 remained the same after the sale, as did his function as store manager. (*Id.* at 77, 182, 272.) After the buyout, Gallant began reporting to Gary Wirth, the District Manager for the Atlanta Region, who reported to Ted Gastman. (*Id.* at 161-62; Wirth Dep. at 6.)

Unlike Gayfer's stores, which relied heavily on discounts and promotions to generate sales, Dillard's is a regular price department store that attempts to position itself at the very top of the market with high merchandising principles. (Gallant Dep. at 170-71, 200; Wirth Dep. at 194-95.) According to the defendant, customer service and the use of suggestive selling is essential to its successful operation. (Wirth Dep. at 194-95.) One example of Dillard's unique sales policy is the "four on the floor" policy, which requires associates in the shoe departments to bring four pairs of shoes to a customer on each occasion in which the customer is requesting a fitting. (Gallant Dep. at 174-75.) The "four on the floor" policy was created by Alex Dillard himself, which, according to Gallant, gives it an air of additional importance. (Gallant Dep. at 175-76.)

On March 25, 1999, Wirth provided Gallant with his first performance evaluation as a Dillard's employee. (Gallant Dep. at 181-82, Ex. 11; Wirth Decl. at ¶ 4.) At that time, the store had achieved 91% of its planned sales and 77% of its gross margin projections. (Gallant Dep. Ex. 11.) The appraisal provided for ratings of "outstanding," "very good," "satisfactory," "marginal," or "unsatisfactory," and Gallant received an overall rating of "satisfactory." (*Id.*) Gallant testified that he did not feel as though the performance evaluation he received was unfair. (*Id.* at 184.) During the review, Gallant voiced his

2

displeasure with the size of the bonus he received from Dillard's, approximately $5,400, and stated that he should be considered for a severance package.[2] (*Id.* at 185-89.) In inquiring about severance, Gallant understood that severance is not provided to an employee unless the employee quits his job. (*Id.* at 188-89.) However, Wirth talked to him and Gallant decided that he would stay and be 100 percent on board. (Wirth Dep. at 215.) Gallant never again conveyed to Wirth that he wanted to leave the company until September 14, 1999. (*Id.* at 216.) However, at Wirth's suggestion, in April, 1999, Gallant called Vice-President Ted Gastman, who was Wirth's supervisor, to question what, in his mind, was a cut in his salary based on the lower bonus, and whether he was not therefore deserving of a severance package. (Gallant Dep. at 287-88.) Gallant claims that Gastman was "plain rude and totally out of control" because Gallant had brought these questions to him, and Gallant believes Gastman made the decision at that time that Gallant "should be let go." (*Id.* at 288.)

In May, 1999, Ted Gastman visited the Tuscaloosa store. (*Id.* at 195.) Wirth later told Gallant that Gastman left the store displeased because he did not like some aspects of its layout. (*Id.* at 198-99). Gastman instructed Gallant to rearrange several of the departments in the store during his visit. (*Id.* at 195.) Gallant subsequently made several moves within

---

[2] A severance plan had been created to provide severance benefits to those Gayfer's employees whose positions were adversely affected by the restructuring from Gayfer's to Dillard's. (Wirth Decl. at ¶ 4.) The severance plan provides the terms of eligibility to participate and the qualifying events that allow an employee to qualify for severance. (*Id.*) There is a dispute over whether Gallant was entitled to a severance package at the time of the takeover. According to the severance plan, packages were offered in certain circumstances. Dillard's argues that since Gallant's job was not eliminated, he did not qualify. Gallant responds that because his bonus was greatly decreased between Gayfer's and Dillard's, his compensation was affected and he was entitled to a package. Gallant acknowledges that under the severance plan, an employee who accepted a position with Dillard's was not entitled to the severance package, and he admits he accepted a job with Dillard's after the buyout. (Gallant Dep. at 290-91.)

the store. (*Id.* at 198.) Gastman visited the store again in June, 1999, and was pleased with the moves that had been made. (*Id.* at 204-06.) During this same period of time, merchandise sales were "not good," as described by Gallant. (*Id.* at 199.) Gallant blames the downturn in sales on Dillard's merchandising policies as a regular price department store, in that Dillard's did not run extensive sales promotions or price reductions like Gayfer's did in the past. (*Id.* at 200.)

On August 31, 1999, Tim Greeney, Dillard's Shoe Coordinator, visited the Tuscaloosa store. (*Id.* at 207-09, Ex. 12.) It is undisputed that the shoe department is an area of particular emphasis at Dillard's. (*Id.* at 207; Wirth Dep. at 163-64.) Greeney issued a report after his visit that identified, among others, the following problems in the shoe departments in the Tuscaloosa store: associates were not following the "four on the floor" policy; associates were not offering to measure customers; and associates were not giving proper customer service. (Gallant Dep., Ex. 12.) Gallant agreed with Greeney's findings in his report and claims he took steps to correct the problems. (*Id.* at 214.)

On September 8, 1999, Alex Dillard and Ted Gastman visited the Tuscaloosa store. (*Id.* at 216-18.) Dillard was disappointed that sales were behind, and he observed associates in the shoe department merely clerking (i.e. merely standing at the register) instead of selling. (*Id.* at 205, 221-22.) Dillard and Gastman also observed that a sales associate in the shoe department was not following the "four on the floor" policy, the same problem identified in Greeney's report of August 31. (Wirth Decl. at ¶ 9; Poole Stmt. at ¶ 5.) Wirth described the September 8, 1999, visit as "a very rough visit," and after the store tour he and Gallant were lectured in the store parking lot about the condition of the store.

4

(Gallant Dep. at 220-21; Wirth Dep. at 83-84.)  Wirth was instructed to follow up with the store on the problems identified.  (Wirth Decl. at ¶ 9.)

After the September 8, 1999, visit, Wirth held a follow-up meeting with Gallant on September 14, 1999, in which he informed him that Dillard and Gastman were not pleased with the visual presentation of the store, that the associates in the shoe department were clerking instead of selling, and that the overall atmosphere of the store was not good. (Gallant Dep. at 225-26; Wirth Decl. at ¶ 10.)  Beyond this initial comment, the court is unclear as to what actually transpired at this meeting.  Dillard's argues that it was at this meeting that Gallant was put on notice that his employment would soon be terminated and that he could work out a notice period until November 1, 1999.  Indeed, the complaint, Gallant's handwritten notes of the meeting, and his deposition testimony seem to make it clear that he was under the impression that he was being terminated and that he would be allowed to work until November 1.  If this is true, then the present action would probably be barred by the 180-day period in which to file a charge of discrimination with the EEOC. *See* 29 U.S.C. § 626(d)(1) (2002).  However, Wirth's deposition testimony appears to indicate that he did not make the decision to terminate Gallant's employment until sometime during the week of September 20, 1999. While Dillard's attempts to cast this decision as one to refuse to allow Gallant to work out his notice period until November 1, it seems clear from Wirth's testimony that the decision to which he was referring was the decision to terminate Gallant's employment in the first place and had nothing to do with an alleged notice period.  This issue will be discussed in greater detail below.

For present purposes, it is undisputed that during the September 14 meeting, Wirth issued Gallant a written disciplinary action indicating that if he did not meet listed expectations, he would be terminated.  (Pla.'s Ex. 6.)  In this written disciplinary action, Gallant was cited for: (1) "not meeting visual presentation standards" in regard to the "home area" and the "classification of clearance"; (2) "associates clerking and not selling to customers" in the shoe department; and (3) the "overall progress of the store not acceptable, not complete, and not at the proper pace."  (*Id.*)  Wirth testified that these were just examples of the deficiencies he found and that he did not have room to list all of the violations of the visual presentation standards.  (Wirth Dep. at 176.)

On Monday, September 20, 1999, Wirth sent Gallant an e-mail asking him to check on the work schedules and to make some needed adjustments.  (Gallant Dep. at 257-58, Ex. 14; Wirth Dep. at 165.)  Dillard's contends that the work schedules for the Tuscaloosa store should have been completed by the second week of September, and that the schedules still remained unfinished on September 20, with some workstations not having any associates assigned to them.  (Wirth Dep. at 170-77; Wirth Decl. at ¶ 13.)

On Tuesday, September 21, 1999, Greeney, the shoe coordinator, made a follow-up visit to the Tuscaloosa store, and found some of the same problems he discovered during his previous visit.  (Gallant Dep. at 260-63.)  Greeney instructed Gallant to complete several tasks with the instruction that "this is a priority." (Gallant Dep. at 260-63, Ex. 15.)

Wirth returned to the store on September 23, 1999, and discovered that the schedules had not been completed as he had previously requested.  (Wirth Dep. at 165.)  According to Dillard's, the failure to complete the schedules posed a potential problem because the

schedules were to be printed that night for handing out to associates. (Wirth Decl. at ¶ 13.) Wirth also claimed to have found the same previously identified problems with the classification of the clearance in the store, recovery, and associates' continuing refusal to practice suggestive selling techniques such as the four on the floor policy. (Wirth Dep. at 165; Wirth Decl. at ¶ 14.) Wirth further found that Gallant had not completed several tasks he had been instructed to do in regard to following up on the reports issued by Greeney and restructuring departments such as the juniors section. (Wirth Dep. at 86-87.)

That day, Wirth issued Gallant a termination notice in which he stated that associates were not following the "four to the floor" program in spite of Alex Dillard's request on September 8, 1999, that no progress on visual standards had been made, that there was no plan for moving the junior area, that the store was not recovered, that clearance had not been classified, that some of the junior clearance has not been moved down as had been previously discussed, and that staffing had not been corrected for October even though schedules were supposed to be printed that night. (Pla.'s Ex. 5.) Wirth informed Gallant that his services were no longer needed and asked him to leave the store. (Wirth Decl. at ¶ 15.) Gallant was forty-eight years of age at the time of his dismissal. (Gallant Dep. at 272.) As a result of his termination, Gallant was not paid any form of severance benefits. (Pla.'s Ex. 1 at ¶ 16; Wirth Decl. at ¶ 12.)

The parties do not dispute that it was Wirth's decision to terminate Gallant. (Wirth Dep. at 69.) Wirth replaced Gallant with Ed Bouley, with whom he had worked in Houston, Texas. (Wirth Dep. at 51-52, 85.) Bouley's first day at the Tuscaloosa store was October 4, 1999. (Wirth Dep. at 112-13.) He was thirty-four years old at that time. (Wirth Dep. at 85.)

On March 14, 2000, Gallant signed his EEOC charge in the office of attorney Douglas McElvy. (Gallant Dep. at 280-81, Ex. 18.) McElvy forwarded Gallant's EEOC charge to the EEOC by letter dated March 14, 2000, and the charge was stamped "received" by the EEOC on March 20, 2000. (Gallant Dep., Ex. 25.)

**III.    Standard.**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movants can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

8

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

**IV.    Discussion.**

In its motion for summary judgment, Dillard's raises two issues. First, it argues that Gallant's claims are due to be dismissed because he did not file his charge with the EEOC within 180 days of the occurrence of the discriminatory act of which he complains. Dillard's also argues that its termination of Gallant's employment was based on legitimate, non-discriminatory reasons that Gallant cannot show to be pretext for age discrimination. Each

9

argument is addressed separately.

### A.     The 180-day Limitations Period

According to the ADEA, an individual aggrieved by a discriminatory act must file, within 180 days, a charge with the EEOC concerning that act. 29 U.S.C. § 626 (d)(1) (2002). In the present case, it is undisputed that Gallant filed his EEOC charge on March 20, 2000. Thus, in order to be timely, the act of which he complains, the termination of his employment, must have occurred no earlier than September 22, 1999. Dillard's argues that Gallant's employment was ended on September 14, 1999, and he was only serving out a notice period thereafter. Gallant argues, however, that the decision to fire him was not made until September 23, 1999.

Dillard's correctly points out that a cause of action under the ADEA accrues at the time of the complained-of decision, not the time at which the effects of the decision are felt. *See Delaware State College v. Ricks*, 449 U.S. 250 (1980). In the present case, then, the time from which to measure the 180-day period is the date on which the decision to fire Gallant was made, not the date on which his employment was actually severed. Dillard's puts forth a plethora of evidence in support of its argument that termination occurred on September 14, including the complaint, Gallant's own notes, his deposition testimony, and a sworn statement by Gary Wirth, the undisputed decision maker. However, Wirth's deposition demonstrates that the decision to terminate may not have been made until he arrived at the Tuscaloosa store on September 23:

> Q:    Tell me about your conversations with Mr. Gastman on your decision to terminate Mr. Gallant.
> A:    I think that week I had talked to -- sometime that week, between the

10

20th and the 23rd [of September], I had contacted Mr. Gastman and was concerned about the performance of Scott, and my recommendation was to terminate Scott.

Q:   When did you first make the recommendation that you wanted to terminate Mr. Gallant?

A:   Sometime that week.  I can't remember.  [I] probably didn't make that determination until I went for the visit on that day, the 23rd, that -- and physically saw that things were not -- not completed.  But I -- I was -- I talked to Mr. Gastman prior to that just to say, you know, this may happen, this may be a viable possibility that things weren't going to be done, and I was not going to find things done, and I was going to terminate him.

. . . .

Q:   Now, did the two of you, when you were there on September 14th, discuss that he was going to be terminated?

A:   We discussed -- I went over this document. . . .

Q:   You're talking about 5?

A:   Yes, document 5, the written documentation, the disciplinary action. . . I went over this with Scott in great detail, we talked about meeting the visual presentation standards, associates clerking and not selling to customers, overall progress of the store, talked about all this issue, gave him an opportunity to talk to me about it.

And then I put it aside, I said this is -- I told him off the record, I said, "Scott, . . . this is not good."  I said, "You're a good guy, but this is not happening, and I'm not sure you're going to make it happen."  And I said he's got to prepare himself, this may not end up very good, he may be terminated.  But I did not terminate at this point, but I did -- I did have a very serious conversation with him about the -- the severity of the situation.

. . . .

Q:   Going back to your meeting on the 14th, did you tell Mr. Gallant on the 14th that termination was the only route they could go, and November 1st would be his last day?

A:   I covered the information on the documentation and told him this is what we needed to do going forward.  Then I pushed the documentation aside and told him seriously that I wasn't sure if he was going to be able to step up and do what we are asking him.  I thought he ought to take a look at his options.

And by saying that, it implied that, yeah, he was going -- going to end his job.  He wanted to know options, he wanted to know how much he would get in severance, and he wanted to know what he would be qualified for in a severance package.

Q:   Did you tell him November 1st was going to be his last day?

11

A:   I told him that -- I don't really recall us talking about a specific date.
If he says November 1st, it could very well be that we gave him a time
limit to start working on some of these bigger projects. But when I left
the meeting that day, he was to get these done, he was to work on --
on the visual presentation, the -- the things we listed here.

Wirth Dep. at 119-20, 124-25, 153-54. This testimony seems to clearly indicate that Wirth did

not decide to end Gallant's employment until September 23.

Citing *McClinton v. Alabama By-Products*, 743 F.2d 1483 (11th Cir. 1984), Dillard's

argues that what is important is not what Wirth thought of the September 14 meeting, but

what Gallant thought of it.  Dillard's asserts that since Gallant's notes reflect that he was

under the impression that his employment was terminated on September 14, with an

effective date of November 1st, his cause of action accrued on September 14, *McClinton*

provides no support to Dillard's, however, as there was no dispute in that case as to when

the discriminatory act occurred, but only as to whether the 180-day time limit was due to be

equitably tolled. *See McClinton*, 743 F.2d at 1486.  Indeed, taking Dillard's argument to its

logical extreme, if an employee was under the impression after a meeting on January 1 that

his employment was being terminated with an effective date of August 1, and the employer

did not actually decide to discharge him until July 20, the time by which the employee was

to file his charge with the EEOC would have run prior to the time that the decision to

terminate his employment was actually made by the employer.

The court finds, then, that there is a question of fact precluding summary judgment

on the 180-day limitations issue raised by Dillard's.  The court acknowledges that there is

significant evidence that the decision to terminate Gallant's employment was made on

September 14, 1999, and communicated to him on that same day, including the complaint,

12

Gallant's own hand-written notes describing the events of September 14, and Wirth's sworn declaration. However, when the above-quoted portions of Wirth's deposition testimony are considered, and the evidence is viewed in the light most favorable to Gallant, the complained-of decision did not occur until Wirth visited the store on September 23, 1999. The court will therefore move on to the merits of Gallant's age discrimination claim.[3]

### B.    The Merits of the ADEA and AADEA Claims

Initially, the court notes that both parties seem to accept that the standards applicable to claims brought under the federal ADEA are applicable to claims brought under the Alabama ADEA. Indeed, the only court, either state or federal, to have addressed this issue has held that identical standards apply under the ADEA and the AADEA. *See Bonham v. Regions Mortgage, Inc.*, 129 F. Supp. 2d 1315, 1321 (M.D. Ala. 2001) ("[B]ecause it is self-evident that the AADEA's purpose and prohibition are like the ADEA's, to promote employment of older persons based on their ability rather than age and to prohibit arbitrary age discrimination in employment, it follows that [the principles governing the order and allocation of proof in ADEA and Title VII cases] should govern in AADEA cases as well.") As both parties have followed this approach, the court will examine Gallant's federal and state age discrimination claims in a parallel and identical fashion.

The Eleventh Circuit applies the same burden-shifting analysis to ADEA claims that the United States Supreme Court set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S.

---

[3] In resolving the limitations issue in such a manner, the court does not reach the issue of whether Gallant's state law action pursuant to the AADEA is timely. Simply put, assuming that Dillard's is correct in arguing that claims brought under the AADEA are subject to the same limitations period as those brought under the ADEA, because there is a question of fact as to whether the ADEA claim is timely, there is also a question of fact as to whether the AADEA claim is timely.

792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) to govern claims brought pursuant to Title VII. *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). Thus, in a case such as this, where there is no direct evidence of discrimination, a plaintiff is required to establish a presumption of discrimination by setting forth a prima facie case. *Id.* One method of so doing is to show that he: "(1) was a member of the protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual." *Id.* Upon such a showing, the burden shifts to the employer to set forth one or more nondiscriminatory explanations for the adverse employment action that it took in regard to the plaintiff. *Id.* This is a burden of production and not one of persuasion. *Id.* Should the employer be able to set forth such a reason, the inference of discrimination that was created by the prima facie case drops out and the burden returns to the plaintiff to show that the employer's proffered explanation is merely a pretext for age discrimination. *Id.*

Applying the foregoing standard to the present case, Dillard's does not dispute that Gallant has carried his initial burden of demonstrating a prima facie case of age discrimination. Indeed, he is clearly a member of the protected class, he was discharged, he was replaced by a younger individual, and there is at least a question of fact as to whether he was qualified to serve as store manager of Dillard's Tuscaloosa store. The burden is therefore shifted to Dillard's to produce one or more legitimate, non-discriminatory reasons for having terminated Gallant's employment. Dillard's has produced two such

14

reasons: (1) he failed to perform several tasks that Wirth had instructed; and (2) he showed no willingness to improve on his performance.

Because Dillard's has advanced two reasons for its termination of Gallant's employment, the inference of discrimination that was created by the prima facie case is gone and the burden now rests with Gallant to demonstrate that the articulated reasons are merely pretext for age discrimination. "Three types of evidence can be used by a plaintiff to prove pretext: 1) comparative evidence; 2) statistical evidence; and 3) direct evidence of discrimination, in the form of discriminatory statements and admissions." *Miles v. M.N.C. Corp.*, 750 F.2d 867, 870 (11th Cir. 1985). Unless Gallant is able to cast doubt on Dillard's proffered reasons, summary judgment is due to be granted in favor of Dillard's.

Taking the second proffered reason first, Dillard's argues that Gallant was fired because he demonstrated no willingness to improve his performance as a manager. As a basis for this assertion, Dillard's points out that a recurring theme during all of the counseling sessions that a supervisor had with Gallant resulted in Gallant's seeking a quote on how much severance he would be entitled to if he quit. While there is a great deal of support in the record for this allegation, it is undercut by a portion of Wirth's deposition in which he discussed Gallant's response to the September 14 counseling session:

Scott and I went over the review on the 14th. He had the opportunity to make any comments, he had an opportunity to dispute what I had to say and what I -- what I found. He agreed to make these corrections, he agreed to cooperate, he agreed to work a hundred percent while he was working at the store.

Wirth Dep. at 132. It seems to the court that Gallant's agreement to make the changes that Wirth had requested and "to work a hundred percent" shows a willingness to improve, at

15

least sufficient to create a fact question regarding Dillard's second non-discriminatory reason.

Gallant, however, has failed to show that Dillard's primary proffered reason is pretextual. According to Dillard's, Wirth had called several problems to Gallant's attention at their September 14 meeting, including, *inter alia*, the failure to properly classify clearance. On September 21, Wirth sent an e-mail to Gallant requesting that he repair and complete the staffing schedule for the month of October, as it should have already been completed and was due to print for distribution to the employees on September 23. It had also been pointed out to Gallant that during Mr. Dillard's visit to the store on September 8, Mr. Dillard had noted that an associate in the shoe department was not following the "four on the floor" policy that he had developed.[4] On September 23, the day that Wirth fired Gallant, Wirth noted on the termination report that Gallant was fired for violation of "Work Rule #4," which states that "Satisfactory job performance is necessary, and conscientious application of effort and ability in performing duties is required." Gallant Dep., Ex. 16. The specific findings that Wirth listed on this report in support of his decision included Gallant's failure to correct the staffing schedule for October, his failure to properly classify clearance, and the failure of associates to follow the "four on the floor" policy in spite of Mr. Dillard's request of September 8. Gallant argues that Dillard's proffered explanation is pretext for

---

[4] Though Gallant claims that he did not see any associates failing to follow the "four on the floor" policy, he does not dispute that just eight days prior to Mr. Dillard's visit, Tim Greeney, the shoe coordinator for Dillard's, reported that associates at the Tuscaloosa store were not following the "four on the floor" policy. Gallant also does not dispute the validity of Greeney's report. Gallant Dep. at 263.

two reasons: (1) the reasons that Wirth gave do not support dismissal, and (2) the manager that followed him, Ed Bouley, did a worse job than he did of managing the store.

Gallant supports his first assertion with the sworn statement of Andy Poole, operations manager under Gallant, that the issues for which Gallant was fired are not the type of issues that would generally support dismissal of a store manager, in that they were "minor issues." Poole Stmt. at para. 4. Poole also stated that the failure of Gallant to complete the schedule for the men's suits area should not have given rise to dismissal in that the men's suits area involved only two employees, each of whom had a set schedule. Gallant further argues that pretext can be gleaned from the fact that he was fired over visual presentation issues even though he had never been given a copy of the visual presentation standards to which Dillard's adheres. He also argues that he was never subject to criticism until he voiced his complaints to Gastman about a low bonus. Gallant next argues that after Wirth fired him, Wirth toured the store with Poole and pointed out "only minor issues" that needed Poole's attention. Finally, Gallant notes that Wirth did not ask him whether he had fixed the October staffing schedule prior to firing him[5]

As to Poole's statement that failure to complete the schedule for the men's suits area was insignificant, the court notes that the men's area was only one of many areas that Wirth had asked Gallant to review and correct. As to the fact that Gallant was fired for failure to follow visual standards of which he was unaware, the evidence clearly demonstrates that,

---

[5]Gallant also states that Dillard's computer schedule system was new to Gayfer's employees and that Wirth provided little training to them. However, Gallant has put forth absolutely no evidence that he did not know how to enter employee schedules as Wirth had requested. Gallant further notes that no employee had complained to Wirth about the schedule prior to his dismissing Gallant. However, this fact is irrelevant in light of the fact that schedules were not due to be printed until the night of September 23 for distribution on the following day.

17

at least as to the classification of clearance, Wirth discussed standards with him during their September 14 meeting.  Indeed, Gallant signed a discipline form during that meeting on which it was noted that such standards had been discussed.  Thus, the fact that Gallant was never given the manual on visual presentation does not show that the reason for dismissal that Wirth gave regarding the failure to classify clearance is pretextual.  Gallant's statement that he was never subject to criticism prior to his argument with Gastman over the size of his bonus certainly does not suggest pretext.  At best, it suggests a separate non-discriminatory reason for Gallant's termination.  In regard to Gallant's argument that Wirth did not ask him about the October staffing schedule before firing him, Wirth's testimony is quite clear that he was able to pull up the schedules in the computer just prior to meeting with Gallant and see that it remained incomplete.

Gallant also notes that because Wirth arrived at the store prior to its opening and toured it for only a short time, there is no way he would have been able to determine whether the associates in the shoe department were practicing the "four on the floor" technique.  Indeed, it is unclear how much time Wirth spent on the floor before meeting with Gallant for the purpose of firing him.  However, Gallant's own notes indicate that the first thing Wirth went over with him during the meeting of September 23 was the report prepared by Tim Greeney on September 21, which clearly indicated that associates were still not following the "four on the floor" policy in the ladies' shoes area (the largest of the shoe departments).  Moreover, even if there is a question of fact as to this reason for firing him, the other reasons, failure to classify clearance and complete the October schedules, remain unrebutted.  Thus, any possible discrepancy regarding Wirth's "four on the floor"

18

complaint does not defeat the remaining bases of Wirth's decision to terminate Gallant as legitimate and non-discriminatory.

The other arguments that Gallant raises in regard to his assertion that the reasons cited by Wirth for his termination do not support dismissal center around his and Poole's feeling that the issues cited by Wirth were "only minor." The law is clear, however, that Gallant is not allowed to "substitute his business judgment for that of the employer." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (2000). Indeed, an employee can be fired for a good, a bad reason, or no reason at all, so long as the reason is not discriminatory. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984). The court also points out that

> [f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior.

*Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (internal quotations and citations omitted). This court is in no position, and, as the foregoing cases illustrate, would go beyond its authority, were it to credit Gallant's argument that Dillard's fired him for reasons that are unimportant. Not only does the court question whether an employee's disobedience of a direct command from his supervisor could ever be termed a "minor issue," the court refuses to pass on a question that the law clearly commits to the business judgment of the employer.

Gallant's other pretext argument, that the manager who followed him, Ed Bouley, was worse than he was, is likewise without merit. Simply put, in order for Bouley to serve as an

19

appropriate point of reference, Gallant is under the obligation to demonstrate to this court that he and Bouley are similarly situated. Clearly, however, they are not. First, Wirth left only a few months into Bouley's tenure as manager and Bouley thereafter answered to a different supervisor. Thus, Gallant and Bouley were each under different relevant decision makers as to their respective employment. Although this may not be dispositive, *see Anderson v. WBMG-42*, 253 F.3d 561, 565-66 (11th Cir. 2001), such a difference goes a long way toward showing that Gallant and Bouley were not similarly situated. *See Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir. 1998), *opinion modified by* 151 F.3d 1321 (1998); *Jones v. Gerwins*, 874 F.2d 1534, 1541 (11th Cir. 1989).

The other major difference between the two is that while Gallant was discharged for failing to accomplish specific tasks at the direct order of his supervisor, Bouley is not alleged to have engaged in any such behavior. While it is true that Bouley may have had some poor reviews, there is simply no evidence that he failed to correct a situation pointed out directly by the owner of the company, failed to classify clearance even after being directly ordered to, or failed to complete a staffing schedule after being directly asked to do so by his supervisor. Simply put, Bouley, though he may not have been a good manager, is not alleged to have engaged in the relevant conduct for which Gallant's employment was terminated.

In summary, the court finds that Gallant's claim for age discrimination under the ADEA fails because he has not shown that at least one of the reasons proffered by Dillard's was merely a pretext for discrimination. As the court discussed initially, the same standards

20

applicable to the federal ADEA are applicable to the Alabama ADEA.  Thus, Gallant's state law claim for age discrimination also fails.

**V.    Conclusion.**

Based on the foregoing, the court finds that Dillard's motion for summary judgment is due to be granted and that this action should be dismissed.  A separate order will be entered contemporaneously with this memorandum of opinion.

Done, this 30th of April, 2002.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE